ORVILLE W. RANNEY et al., Plaintiffs in Error,

*vs.*

LEWIS J. HIGBY, Defendant in Error.

ERROR TO MILWAUKEE CIRCUIT COURT.

H., a merchant at Milwaukee, ordered 1,500 bbls. of salt of R. & Co., merchants at Buffalo, to be shipped to him at Milwaukee, by certain vessels, with directions to insure, for the benefit of R. & Co. in case of loss. R. shipped 350 bbls. on board vessel in the usual manner. On the voyage from Buffalo to Milwaukee, the salt was lost in consequence of a storm. *Held*, that the delivery of the salt by R. & Co. on board the vessel at Buffalo, was a constructive delivery to H.

Where H. at Milwaukee had ordered a quantity of salt in barrels of R. & Co. in Buffalo, and 350 bbls. were forwarded, at the price of 8s. 6d. per bbl. cash, or 110c. at sixty days, at the election of the purchaser; *Held*, that this was not a conditional sale, that the property vested in the purchaser on the delivery to the master of the vessel at Buffalo, and that it was at the option of the purchaser, to make either the cash or the time payment.

THIS was an action of assumpsit for 350 barrels of salt sold by the plaintiffs to the defendant in November, 1851, and shipped at Buffalo on the schooner Juniatta Patton, to him at Milwaukee. Declaration, the common counts for goods sold, with bill of particulars. Plea, general issue.

The case was tried at the term of May, 1855, and on the trial the following proceedings were had. The plaintiffs offered and read in evidence the following letter from them to the defendant, together with other evidence herein set forth.

"*Buffalo, Nov.* 13, 1851.

"L. J. HIGBY, Esq.:

"*Dear Sir:*—We have shipped you, per brig Helfenstein, 300 bbls. fine salt, at 30c. freight, and have insured the same at 9s. per barrel. If you wish to pay cash for it, we will take 8s. 6d. per bbl., or 110c. at sixty days. This is all we could get the H. to take. The Hale will be here soon, we suppose, and should you want more, telegraph us. Yours, &c.,

"O. W. RANNEY & Co."

And a letter from the defendant to the plaintiffs, as follows:

"*Milwaukee, Nov.* 17, 1851.

"O. W. RANNEY & Co.:—I received your letter to-day, and

Ranney et al. vs. Higby.

advice of 300 bbls. salt on brig Helfenstein, at 30c. freight, and bill same at 110—sixty days. I should not paid the difference you make six days since, but just made an investment, which cuts me short of ready means. I also telegraphed to send me here 1.500 bbls. salt, and if you cannot send the 500 bbls. to Sheboygan at, say 10c. more per bbl. than here, you need not send it; but if you can, send it.

"Do the best you can in ft. contract, and advise me. Get it insured for your benefit if lost. The 500 to Sheboygan is in addition to the 1,500 here, and if you cannot send to advantage that amount, send what you can. Let me hear from you on receipt. "Yours, &c.,

"L. J. Higby."

And also a letter received by the defendent from the plaintiffs, the material part of which is as follows:

"Buffalo, Nov. 19, 1855.

"L. J. Higby, Esq.:

"Dear Sir:—Your telegraph for 1.500 bbls. salt was received yesterday, and to-day we have shipped per schooner Sam Hale 1.000 bbls., and per schooner Juniatta Patton, 350. This is all they would take. The Patton took at 30c. freight. These vessels will get through, if any can.

"We shall probably draw on you at sixty days for bill of purchase and insurance. It is all in nice order, though it has snowed all the time it was going on board, and will come out wet, still that will not hurt it. "Yours, &c.,

"O. W. Ranney & Co."

The plaintiffs then offered in evidence a telegraphic dispatch, with a printed heading in the usual form, and containing the following. The words in italics were in the original, in writing, and the remainder in print:

"Buffalo, Nov. 18, 1851——o'clock, P. M.

"By Telegraph from Milwaukee.

"To O. W. Ranney & Co.:

"Send me here fifteen hundred barrels salt as per letter on sixty days. "A. J. HIGBY."

Which was objected to by the defendant as not sufficiently identified or proven, but was admitted by the court.

The deposition of Watson Spencer was then read by the plain-

tiffs, to the effect that in November, 1851, he was captain of the schooner Juniatta Patton. That on or about the 19th of that month, 300 barrels of salt (he thought that was the quantity, but it was admitted by the defendant's counsel to have been in fact 350 bbls.) were shipped on that vessel by the plaintiffs at Buffalo, consigned to the defendant at Milwaukee. That he signed the bill of lading of the salt on the same day, he thought, that the salt came on board. He made only one trip from Buffalo that month.

On cross-examination he stated, under objection from the plaintiffs' counsel, that the salt was lost in a storm on the way to Milwaukee, and was not received by the defendant.

The plaintiffs then gave in evidence the bill of lading of the salt, which was in the usual form, signed by the master, and showing the shipment by the plaintiffs from Buffalo, Nov. 19, 1851, to the defendant at Milwaukee, on the Patton, of 350 barrels fine salt, at thirty cents freight.

The plaintiffs then rested their case, when the judge, on the defendant's motion, ordered a nonsuit, to which the plaintiffs excepted.

Judgment was entered accordingly, and the plaintiffs have brought error.

*Winfield Smith*, for the plaintiffs in error.

*Brown & Ogden*, for the defendants in error.

*By the Court*, COLE, J. We think that the nonsuit in this case was improperly granted. The order for the salt, the price and the shipment by the plaintiffs to the defendant, being proven, made out, to say the least of it, a *prima facie* case for the plaintiffs. It is contended by the counsel for the defendant, that the contract established by the letters and telegraphic dispatch, required the plaintiffs to insure the salt for their own benefit, if lost; and that inasmuch as it was shown by the cross-examination of Spencer, the captain of the schooner Patton, upon which the salt was shipped; that the salt was lost in a storm on the way to Milwaukee; therefore, the defendant is not liable. We do not thus understand this contract, and the rights and liabili-

ties of the parties who made it. It seems to be the ordinary case of sale and delivery of goods by the vendor to a master of a vessel to be carried to the purchaser. The salt was consigned in the bill of lading to the defendant, in pursuance of the order, to forward 1,500 bbls. to Milwaukee, to him there, and the delivery of the 350 bbls. on board the Patton, was a constructive delivery of so much to the defendant, and vested the property in him. We see nothing in the letters to warrant any other conclusion. The sale and delivery were unconditional, and the property became absolutely the defendant's. And we think it quite apparent that such was the defendant's own understanding of the agreement, else why should he request the plaintiffs to do the best they could on the freight contract. If the sale and delivery at Buffalo were not absolute, but it was at defendant's election to receive the salt at Milwaukee or not, as they could agree upon terms, then the matter of freight would not materially concern him. There is nothing in the circumstance that the price and terms of payment had not been expressly agreed upon, to vary the effect of the contract. The defendant had ordered salt before, without agreeing upon the price and terms of payment, as appears from the letter of November 13, 1851. We suppose this is the almost invariable mode of doing business in this country. A merchant inland orders goods to be sent him from cities where he is accustomed to buy his stock, expecting, of course, in the absence of all special contracts, to pay the market price at the time they are ordered. Can you conclude that, because the goods are forwarded with the bill, containing the price and terms of payment, that, therefore, the bargain is incomplete, and the safe arrival of the goods at the risk of the vendor? It is quite true that the previous transaction shows that the plaintiffs made a difference between a cash purchase and one upon time. They had given the defendant the choice of paying $1.06 per bbl. down, or $1.10 at 60 days. But what can be inferred from that? That the sale is a conditional one? That the vendee may rescind the contract, refuse to accept the goods, because the privilege is given him of paying for them down or upon time? Certainly not.

But it is said that in this case the plaintiffs were ordered by the letter of the 17th of November, 1851, to insure the salt for their

own benefit, in case of loss, and that the course of trade between the parties showed that the plaintiffs were accustomed to insure, and that this circumstance in some unexplained manner affected the liability of the defendant, and rendered the sale a conditional one. The reasoning by which this position is attempted to be maintained, is not very clear or satisfactory. In the first place, it is very manifest, we think, that the salt was shipped upon the strength of, or in compliance with the telegraphic dispatch, and before the letter containing the order to insure came to hand. But suppose it otherwise, and that the letter of the 17th of November was received by the plaintiffs before the salt was shipped on the Patton; what then? There was the order for the salt unconditional and unqualified. There, too, was the order to insure for their protection: "I also telegraph to send me here 1,500 bbls. of salt, and if you cannot send 500 bbls. to Sheboygan, at, say 10c. more per bbl. than here, you need not send it; but if you can, send it. Do the best you can in freight contract, and advise me. Get it insured for your benefit, if lost. The 500 to Sheboygan is in addition to the 1,500 here, and if you cannot send to advantage that amount, send what you can. Let me hear from you on receipt." That is the language of the defendant, brief, but easily understood. Now, there is no proof that we are able to find, that the plaintiffs did not insure the salt. If they did, and insured for their own benefit, then it was incumbent upon the defendant to show that they had been paid for the salt by the money secured upon the policy. This was proper matter of defence. If, on the contrary, they did not insure when it was their duty so to do, whether from express instructions given them, or from the general course of trade between the parties, then they have failed to discharge their duties as agents, have been guilty of breach of trust, and are liable for their negligence. But we do not feel called upon to decide now, whether that would be a matter of defence in this action by way of recoupment, or a distinct subject of inquiry in a special action on the case.

The judgment of the Circuit Court granting the nonsuit, is reversed with costs, and a *venire facias de novo* ordered.